UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**JEFFERY TODD CRYSTAL,**

    Petitioner,

v.                                    Case No. 8:21-cv-1098-MSS-CPT

**SECRETARY, DEPARTMENT
OF CORRECTIONS,**

    Respondent.
_____/

**O R D E R**

Crystal petitions for a writ of habeas corpus under 28 U.S.C. § 2254 and challenges his state court convictions for scheme to defraud and grand theft. (Doc. 1) The Respondent asserts that the petition is time barred. (Doc. 18) Crystal does not reply. After reviewing the pleadings and the relevant state court record, the Court **DISMISSES** the petition as time barred.

**PROCEDURAL HISTORY**

In Case Number 05-CF-16608, Crystal pleaded guilty to organized scheme to defraud, and the trial judge sentenced Crystal to thirty months in prison and thirty-six months of probation. (Doc. 9-2 at 63–66) After Crystal's release from prison, a probation officer filed an affidavit alleging that Crystal violated the conditions of his probation by committing new crimes and failing to pay court costs and fees. (Doc. 9-2 at 77–79) Crystal admitted that he violated the conditions of probation, and the trial judge revoked probation and sentenced Crystal to ten years in prison. (Doc. 9-2 at 111–14, 117–19)

In Case Number 07-CF-16210, Crystal pleaded guilty to grand theft, and the trial judge sentenced Crystal to thirty months in prison and thirty-six months of probation and imposed

1

the sentence to run concurrently with the sentence in Case Number 05-CF-16608. (Doc. 9-2 at 147–50) After Crystal's release from prison, a probation officer filed an affidavit alleging that Crystal violated the conditions of his probation by committing new crimes and failing to pay court costs and fees. (Doc. 9-2 at 77–79) Crystal admitted that he violated the conditions of probation, and the trial judge revoked probation and imposed a ten-year prison that runs concurrently with the sentence in Case Number 05-CF-16608. (Doc. 9-2 at 111–14, 154-56)

In a consolidated appeal Crystal appealed both sentences (Doc. 9-2 at 122) and moved under Rule 3.800(b)(2), Florida Rules of Criminal Procedure, to correct his sentence while the direct appeal was pending. (Doc. 9-2 at 186–88) The trial judge granted the motion and amended the sentences to award credit for time that Crystal served in a jail in Georgia. (Doc. 9-2 at 231–32, 236–41) The state appellate court affirmed without prejudice for Crystal to raise any claim challenging the voluntariness of his plea in post-conviction proceedings. (Doc. 9-2 at 287–88)

Crystal filed a motion under Rule 3.800(c), Florida Rules of Criminal Procedure, to reduce or modify his sentence (Doc. 9-2 at 292–95), and the post-conviction court denied relief. (Doc. 9-2 at 333–34) Crystal filed a petition under Rule 9.141(d), Florida Rules of Appellate Procedure, alleging ineffective assistance of appellate counsel (Doc. 9-2 at 343–57), and the state appellate court denied relief. (Doc. 9-2 at 428) Crystal filed a motion under Rule 3.850, Florida Rules of Criminal Procedure, for post-conviction relief (Doc. 9-2 at 435–51), the post-conviction court denied relief (Doc. 9-2 at 698–706), and the state appellate court affirmed. (Doc. 9-2 at 888)

Crystal filed a motion under Rule 3.800(a), Florida Rules of Criminal Procedure, to correct his sentence (Doc. 9-2 at 910–18), the post-conviction court construed the motion as

a Rule 3.850 motion and dismissed the motion as untimely (Doc. 9-2 at 919–21), and the state appellate court affirmed. (Doc. 9-2 at 969) Crystal filed a second Rule 3.800(a) motion (Doc. 9-2 at 977–85), the post-conviction court construed the motion as a Rule 3.850 motion and dismissed the motion as untimely (Doc. 9-2 at 987–89), and the state appellate court affirmed. (Doc. 9-2 at 1011)

Crystal's federal petition followed. In his federal petition, Crystal asserts that (1) the trial judge violated his federal right to due process by accepting his admission that he violated the conditions of his probation without conducting a colloquy to determine whether he knowingly and voluntarily admitted the violations, (2) trial counsel deficiently performed by failing to object to an erroneous scoresheet that the prosecutor presented to the trial judge at sentencing, and (3) the trial judge lacked subject matter jurisdiction over the prosecutions in Case Numbers 05-CF-16608 and 07-CF-16210. (Doc. 1 at 28–85)

## ANALYSIS

A one-year statute of limitation applies to a federal habeas petition challenging a state court judgment. 28 U.S.C. § 2244(d)(1). The limitation begins to run "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).

On May 27, 2008, after Crystal pleaded guilty, the state court clerk entered the original judgments and sentences. (Doc. 9-2 at 63–66, 147–50) Crystal did not appeal, and the time to appeal expired thirty days later — June 26, 2008. Fla. R. App. P. 9.140(b)(3). The limitation started to run the next day. Fed. R. Civ. P. 6(a)(1)(A). *Murphy v. United States*, 634 F.3d 1303, 1307 (11th Cir. 2011).

However, after Crystal admitted to violating the conditions of his probation, the trial judge revoked probation and re-sentenced Crystal to ten years in prison in both cases. (Doc. 9-2 at 117–19, 154–56) The new ten-year sentences currently imprison Crystal. Consequently, the limitation reset when the orders revoking probation and the new ten-year sentences became final. *Ferreira v. Sec'y, Dep't Corrs.*, 494 F.3d 1286, 1293 (11th Cir. 2007) ("AEDPA's statute of limitations begins to run from the date both the conviction *and* the sentence the petitioner is serving at the time he files his application become final because judgment is based on both the conviction and the sentence.") (italics in original).

The orders revoking probation and the new ten-year sentences became final when Crystal's appeal of the revocation proceedings[1] concluded. 28 U.S.C. § 2244(d)(1)(A). On October 19, 2016, the state appellate court affirmed the orders revoking probation and the ten-year sentences in a decision without a written opinion. (Doc. 9-2 at 287–88) Because the state supreme court lacked jurisdiction to review the summary affirmance, Crystal could have sought further review only in the United States Supreme Court. *Bates v. Sec'y, Dep't Corrs.*, 964 F.3d 1326, 1329 (11th Cir. 2020); *Jenkins v. State*, 385 So. 2d 1356, 1359 (Fla. 1980). Crystal did not seek further review, and the time to seek further review expired ninety days after the summary affirmance — January 17, 2017. Sup. Ct. R. 13.1(1). The limitation began to run the next day. Fed. R. Civ. P. 6(a)(1)(A). *Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002).

The limitation period tolls while "a properly filed application for State post-conviction or other collateral review" is pending. 28 U.S.C. § 2244(d)(2). On November 15, 2016, before the limitation period started, Crystal placed in the hands of prison officials for mailing his

---

[1] Under Florida law, a defendant is entitled to appeal an order revoking probation. § 924.06(1)(c), Fla. Stat. Fla. R. App. P. 9.140(b)(1)(D).

Rule 3.800(c) motion. (Doc. 9-2 at 292–95) On February 7, 2018, the post-conviction court construed the motion as a Rule 3.850 motion and denied the construed motion as successive and moot. (Doc. 9-2 at 333–34) Crystal did not appeal, and the limitation began to run thirty days later, when the time to appeal expired — March 9, 2018. Fla. R. App. P. 9.110(b) and 9.141(b)(1).

On November 27, 2017, Crystal placed in the hands of prison officials for mailing a Rule 3.850 motion (Doc. 9-2 at 435–51); the post-conviction court denied relief (Doc. 9-2 at 698–706); and, the state appellate court affirmed. (Doc. 9-2 at 888) The limitation continued to toll until the mandate issued on post-conviction appeal — March 11, 2020. (Doc. 9-2 at 904) The limitation continued to run for a year and expired March 12, 2021. On May 3, 2021, Crystal placed in the hands of prison officials for mailing his federal petition. (Doc. 1 at 1) Consequently, he untimely filed his federal petition.

On January 22, 2020, Crystal placed in the hands of prison officials for mailing a Rule 3.800(a) motion. (Doc. 9-2 at 910–18) The post-conviction court construed the motion as a Rule 3.850 motion and dismissed the motion as untimely and successive (Doc. 9-2 at 919–21) (state court record citations omitted):

> In the instant motion, the Defendant claims his sentence is illegal because he was not awarded the proper jail credit that was orally pronounced. A claim that an oral pronouncement conflicts with a written sentence is cognizable in a Rule 3.800(a) motion to correct an illegal sentence. *See Ferguson v. State*, 778 So. 2d 387 (Fla. 2d DCA 2001). When an orally pronounced sentence differs from a written sentence, the orally pronounced sentence is controlling. *See Barnes v. State*, 977 So. 2d 801, 802 (Fla. 2d DCA 2008). Here, according to the Defendant, during his sentencing hearing, the court orally pronounced that he should receive jail credit for the time he spent incarcerated in custody while out-of-state, in Georgia, for which he claims was from "Gwinnett, Henry, and Fulton counties from November 3, 2011, through December 13, 2013," (772 days.) He claims that despite

5

the court's oral pronouncement, his judgment and sentence reflects that he "was only awarded 1,828 days' jail time served," but that this amount did not account for the full time he spent incarcerated in Georgia. He claims that taking into account the time he spent incarcerated in Georgia, he should have actually been awarded "a total of 2,190-days" jail credit.

The record refutes the Defendant's claim. At his June 3, 2015, sentencing, the court used its discretion to allow out-of-state credit and advised the defendant to file a motion with the proper documentation for time spent in Georgia. On March 11, 2016, counsel filed a motion to correct sentencing error requesting credit for time served in Georgia, which was set for a status conference on April 22, 2016. At the status check, it was discussed that the Defendant's actual credit for time served in Florida was 1,374 days, however, with Georgia credit it would be 1,828 days. That same day this court entered an order *nunc pro tunc* and granted the Defendant an additional 427 days of credit for a total of 1,828 days.

Claims for out-of-state jail credit must be raised in a timely, facially sufficient Rule 3.850 motion for post-conviction relief alleging ineffective assistance of trial counsel for failure to move for out-of-state jail credit. *See Garnett v. State*, 957 So. 2d 32, 33 (Fla. 2d DCA 2007); *Gisi v. State*, 135 So. 3d 493, 495 (Fla. 2d DCA 2014). This is because a defendant is not entitled to out-of-state jail credit as a matter of right, but instead may be granted at the discretion of the trial court. *Id.* at 34–35. The court could consider the Defendant's motion pursuant to Rule 3.850 because it contains a proper oath[.] [H]owever, the motion is untimely and successive. A Rule 3.850 motion must be filed within two years of the date the judgment and sentence become final. Fla. R. Crim. P. 3.850(b). A judgment and sentence become final thirty days after entry or, in the event of appeal, when the mandate issues from appeal. *See Beaty*, 701 So. 2d at 857; *Saavedra*, 59 So. 3d at 192. Defendant's judgment and sentence became final when the mandate issued from appeal on November 14, 2016. The court notes that on December 4, 2017, the Defendant previously raised this claim in a motion for post-conviction relief and the motion was denied on its merits on January 18, 2019. Defendants are not entitled to successive review of claims that have already been denied on the merits. *See McBride*, 848 So. 2d at 291. Therefore, the court declines to revisit this untimely and successive claim. In addition, the court notes that the Defendant appealed [the order denying] his [Rule] 3.850 [motion], and the Second District Court of Appeal issued the

6

> mandate on March 11, 2020. Accordingly, it is ordered and adjudged that Defendant's motion is hereby dismissed.

The state appellate court affirmed in a decision without a written opinion. (Doc. 9-2 at 969)

"[A] state court motion for post-conviction relief cannot be considered 'properly filed' for tolling under Section 2244(d)(2) if the motion was untimely under state law." *Jones v. Sec'y, Dep't Corrs.*, 906 F.3d 1339, 1342 (11th Cir. 2018) (citing *Pace v. DiGuglielmo*, 544 U.S. 408 (2005)). If a state court determines that a post-conviction motion is untimely, a federal court must defer to the state court's ruling. *Jones*, 906 F.3d at 1350 ("[T]he state court ruled that the Rule 3.850 Motion was untimely, and we are required to defer to that ruling. . . . *Pace* is quite emphatic on this point: 'When a post-conviction petition is untimely under state law, that is the end of the matter for purposes of Section 2244(d)(2).'") (quoting *Pace*, 544 U.S. at 414). Consequently, Crystal's untimely Rule 3.850 motion did not toll the limitation. *Jones*, 906 F.3d at 1352.

Also, on October 21, 2020, Crystal placed in the hands of prison officials for mailing a second Rule 3.800(a) motion. (Doc. 9-2 at 977–85) The post-conviction court construed the motion as a Rule 3.850 motion and dismissed the motion as untimely (Doc. 9-2 at 988) (state court record citations omitted):

> Pursuant to Florida Rule of Criminal Procedure 3.800(a), the trial court may correct an illegal sentence if the record, on its face, reveals that the defendant is entitled to such relief. *Carter v. State*, 786 So. 2d 1173, 1178 (Fla. 2001). A sentence is illegal if it exceeds the maximum statutory penalty allowed by law. *See State v. Callaway*, 658 So. 2d 983, 988 (Fla. 1995). It is the party seeking relief that bears the burden of demonstrating why a sentence is illegal as a matter of law. *Prieto v. State*, 627 So. 2d 20 (Fla. 2d DCA 1993).
>
> Defendant raises one ground for relief in his instant motion. He alleges that the assistant state attorney mischaracterized and fabricated his prior convictions, failing to produce judgments

7

> and sentences of the prior convictions, resulting in an erroneous scoresheet. He requests that his scoresheet be recalculated without any prior convictions scored or, in the alternative, have the assistant state attorney file the judgments and sentences to support the prior convictions listed on the scoresheet. Defendant raises a scoresheet error that is not apparent on the face of the record; thus, it cannot be considered in a Rule 3.800(a) motion but is appropriately brought as an ineffective assistance of counsel claim under Florida Rule of Criminal Procedure 3.850. *See Butdorf v. State*, 150 So. 3d 849, 851 (Fla. 2d DCA 2014); *Lomont v. State*, 506 So. 2d 1141, 1142 (Fla. 2d DCA 1987) (holding that a challenge to the assessment of points for felony convictions is not a claim of scoresheet error that can be resolved on the face of the record and is cognizable in a Rule 3.850 motion only if raised as a claim of ineffective assistance in failing to object to such an error). However, Defendant's motion would be untimely under Rule 3.850. See Fla. R. Crim. P. 3.850(b); *Beaty v. State*, 701 So. 2d 856 (Fla. 1997). Therefore, Defendant's motion is dismissed. Accordingly, it is ordered and adjudged that Defendant's motion is hereby dismissed.

The state appellate court affirmed in a decision without a written opinion. (Doc. 9-2 at 1011)

Because the post-conviction court dismissed the second construed Rule 3.850 motion as untimely, the motion did not toll the limitation. *Jones*, 906 F.3d at 1350 (citing *Pace*, 544 U.S. at 414).

Crystal asserts that arrest affidavits in his state criminal cases demonstrate his actual innocence. (Doc. 3 at 16–17) "[T]enable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). "To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup*, 513 U.S. at 324.

8

Crystal fails to submit new reliable evidence that demonstrates his actual innocence and instead argues that sworn facts in the arrest affidavits fail to state a crime. (Doc. 3 at 16–17) The affidavit that supported the warrant for Crystal's arrest for organized scheme to defraud stated (Doc. 9-2 at 52–56):

> Your Affiant, Andrew C. Wagner, is a duly sworn United States Postal Inspector for the United States Postal Inspection Service. Your affiant states that beginning on or about September 24, 2004, and continuing through on or about October 12, 2004, [Crystal] and Brandi Lashann Ellington did commit the offense of organized fraud, Florida State Statute 817.034(4)(a)(1), to wit: did then and there engage in a systematic, ongoing course of conduct, with intent to defraud one or more persons, or with intent to obtain property from one or more persons by false or fraudulent pretenses, representations, or promises or willful misrepresentation of a future act, [and] did obtain U.S. currency with an aggregate value of $50,000.00 or more. Specifically, your affiant's investigation has determined that [Crystal] received a check, via U.S. Postal Service, from Chase Manhattan Bank by mistake as a result of a July 2004 "Mass Mailing" from Chase Manhattan Bank. The original Chase Manhattan Bank account, opened by Machetta V. Grays-Crystal and [Crystal], was closed and a bankruptcy was filed on the remaining balance of $4,502.71 in U.S. currency on October 7, 2002. The check that [Crystal] should not have received was made payable to "Crystal Group Marketing" on October 5, 2004, in the amount of $325,000.00 in U.S. currency and was deposited into a Merrill Lynch account set up by [Crystal] and [Ellington].
>
> Your affiant became involved in this investigation after Chase Manhattan Bank mistakenly mailed a convenience check to Machetta V. Grays-Crystal and [Crystal] after the Chase Manhattan Bank account had been closed on October 7, 2002. The Chase Manhattan Bank account was initially opened by Machetta V. Grays-Crystal and [Crystal] prior to March 3, 2000. However, your affiant learned that the Chase Manhattan Bank account was closed and bankruptcy was filed by Machetta V. Grays-Crystal on October 7, 2002. The check was mailed to 10335 Millport Drive, Tampa, Florida, between July 28, 2004, and August 2, 2004. The check that was mailed mistakenly was made payable to "Crystal Group Marketing" in the amount of $325,000.00 in U.S. currency. Your affiant learned from Chase Manhattan Bank Senior Investigator Robert S. Kowalski that the

9

convenience check went through the Chase Manhattan Bank system, and because of the dollar amount, $325,000.00 in U.S. currency, was out sorted. Your affiant learned that the clerk mis-keyed the amount as a return item of $325.00 in U.S. currency, instead of $325,000.00 in U.S. currency, resulting in the clearing of the remaining amount.

Your affiant learned that on September 24, 2004, the account with Merrill Lynch was opened in the name of "Crystal Group Marketing." The account was opened at the Merrill Lynch Office located at 26301 U.S. Highway 19 North, Clearwater, Florida, by [Crystal] and [Ellington].

On December 13, 2004, your affiant traveled to Merrill Lynch in Clearwater, Florida to interview several prospective witnesses. As a result of the interviews, your affiant learned that both [Crystal] and [Ellington] provided Merrill Lynch Financial Advisor Dov Litov [ ] signed applications including social security numbers, home addresses, and tax numbers from a corporation supposedly owned and operated by [Crystal]. Your affiant learned that both [Crystal] and [Ellington] provided a residential address of 10335 Millport Drive, Tampa, Florida. Furthermore, both [Crystal] and [Ellington] provided their business address of 12157 West Linebaugh Avenue, #308, Tampa, Florida. Your affiant traveled to 12157 West Linebaugh Avenue, #308, Tampa, Florida, and learned that the address provided by [Crystal] and [Ellington] was a "UPS Store." Your affiant learned that UPS Box # 308 was opened on May 3, 2003, in the names of [Crystal] and "J.T. Crystal Corp." The address listed on the UPS Store application was 10335 Millport Drive, Tampa, Florida, (813) 926-1399, and business phone (813) 760-6049. Your affiant learned that [Crystal] provided his Florida Driver's License Number, C623-438-60-466-0. Your affiant has confirmed through the Florida Department of Highway Safety and Motor Vehicles database that Florida Driver's License Number C623-438-60-466-0 is registered to [Crystal] of 10335 Millport Drive, Tampa, Florida, 33626.

Your affiant learned that between October 5, 2004, and October 12, 2004, [Crystal] deposited the following checks into the [ ] Merrill Lynch account:

| Name | Bank | Date | Amount |
|---|---|---|---|
| [Crystal] | AmSouth | 10/6/2004 | $22,800.00 |

| | | | |
|---|---|---|---|
| [Crystal] | AmSouth | 10/12/2004 | $28,000.00 |
| [Crystal] | Am South | 10/11/2004 | $29,400.00 |
| [Crystal] | SunTrust | 10/12/2004 | $29,000.00 |
| [Crystal] | SunTrust | 10/12/2004 | $89,107.02 |
| J.T. Crystal Corp. | SunTrust | 10/6/2004 | $128,000.00 |
| J.T. Crystal Corp. | Wachovia | 10/5/2004 | $24,000.00 |
| [Crystal] | AMEX Fin. | 10/6/2004 | $126,000.00 |

Your affiant also learned that the convenience check that was delivered in error by Chase Manhattan Bank was deposited during this time frame on October 5, 2004, in the amount of $325,000.00 in U.S. currency. Your affiant learned that when checks are deposited with Merrill Lynch, the customer must go to a Merrill Lynch office and present the checks to be deposited to the teller. Your affiant has learned that [Crystal] deposited the checks at Merrill Lynch office locations in Clearwater, St. Petersburg, Sarasota, and Tampa, Florida.

Your affiant also learned that as part of the Merrill Lynch account, once the account is opened, the individual is issued a Visa debit card, which is guaranteed by FDIC Banc One in Columbus, Ohio. Resident Director of Merrill Lynch, Simon Wheeldon, stated he discovered that [Crystal's] checks were being returned "Account Closed." Your affiant learned that Director Wheeldon checked [Crystal's] account and discovered that $98,000.00 in U.S. currency was wired to "Bert Smith Porsche" and another $107,000.00 in U.S. currency was charged on the [ ] debit card.

Your affiant learned that [Crystal] wired $98,000.00 in U.S. currency to Bert Smith Porsche in order to purchase a 2004 Porsche Cayenne Turbo SUV. However, [Crystal] initially tried to purchase the vehicle by check, but the check did not clear. The check was drawn from Wachovia Bank, under the account of Crystal Group Marketing, LLC, 12157 Linebaugh Avenue, #308, Tampa, Florida. Your affiant learned that [Crystal] provided his Florida Driver's License Number C623-438-60-466-0, showing an address of 10335 Millport Drive, Tampa, Florida, 33626. The purchase price for the car was $98,310.19 in U.S. currency. [Crystal] wired the $98,000.00 in U.S. currency

11

> to Bert Smith Porsche from his Merrill Lynch account. However, since [Crystal] was $310.19 in U.S. currency short on the purchase price, he returned to Bert Smith Porsche and paid the difference in cash. Your affiant learned the date of the contract was October 1, 2004. Additionally, employees at Bert Smith Porsche identified both [Crystal] and [Ellington] as the individuals involved in the transaction after reviewing photopacks.
>
> Based on the aforementioned investigation your affiant has learned that [Crystal] and [Ellington] set up a Merrill Lynch account with U.S. currency that they should not have received from Chase Manhattan Bank because the pre-existing account with Chase Manhattan Bank had been closed due to a bankruptcy that had been filed on the remaining balance, as well as checks drawn on other closed accounts. Furthermore, [Crystal] and [Ellington] obtained property and/or U.S. currency from one or more persons by false or fraudulent pretenses, representations, or promises with an aggregate value of more than $50,000.00.

Crystal pleaded guilty to organized scheme to defraud, in violation of Section 817.034, Florida Statutes. (Doc. 9-2 at 63) *Pizzo v. State*, 945 So. 2d 1203, 1207 (Fla. 2006), identifies the following elements for the crime:

> (1) Engaging in or furthering a systematic, ongoing course of conduct (2) with (a) intent to defraud, or (b) intent to obtain property by false or fraudulent pretenses, representations, or promises, or willful misrepresentations of a future act, (3) resulting in temporarily or permanently depriving any person of the right to property or a benefit therefrom, or appropriating the property to one's own use or to the use of another person not entitled thereto.

Crystal filed for bankruptcy and closed a Chase bank account with a balance of $4,502.71. After the account closed, Crystal erroneously received a check for $325,000.00 from Chase for the closed account. Crystal defrauded Merrill Lynch by depositing the check for $325,000.00 into an account with Merrill Lynch, knowing that his account with Chase did not have a balance of $325,000.00. Crystal deposited checks from other accounts into the

account with Merrill Lynch, and the checks returned marked "Account Closed." Crystal further defrauded Merrill Lynch and retailers by charging $107,000.00 to a debit card linked to the Merrill Lynch account and by wiring $98,000.00 from the Merrill Lynch account to a car dealership for the purchase of a car.

This evidence demonstrates that Crystal violated Section 817.034 by engaging in an ongoing course of conduct with the intent to fraudulently obtain property. *Beamon v. State*, 23 So. 3d 209, 210 (Fla. 4th DCA 2009) ("[U]sing a stolen debit card over the course of a month in twenty-eight separate transactions can fairly be described as 'an ongoing course of conduct.' We further agree that her use of the card was necessarily accompanied by an implied representation that she was lawfully entitled to use the card for each transaction to obtain money or goods for herself.").

The affidavit that supported the warrant for Crystal's arrest for grand theft stated (Doc. 9-2 at 140–43):

> Your Affiant, Andrew C. Wagner, is a duly sworn United States Postal Inspector for the United States Postal Inspection Service, with more than nineteen years of law enforcement experience. Your affiant states that beginning on or about March 1, 2007, and continuing through on or about July 7, 2007, [Crystal] did commit the offense of Grand Theft, Florida State Statute 812.014(1) [and] (2)(b)(1), to wit: did knowingly and unlawfully obtain or use, or endeavor to obtain or use, the property of another, to-wit: U.S. Currency, of the value of $20,000.00 or more but less than $100,000.00, with the intent to deprive Chen Chiou Chin temporarily or permanently of a right to the property or benefit therefrom, or with the intent to appropriate the property to his own use or to the use of any person not entitled thereto.
>
> Your Affiant became involved in this investigation after being contacted by the Office of Financial Regulation, which had received a complaint on behalf of Chen [Chiou] Chin. Your Affiant spoke with Chen Chiou Chin, and learned that Mr. Chin was a neighbor of [Crystal's], both residing in Hillsborough

13

County, Florida, and was aware that [Crystal] was a mortgage broker. Your Affiant learned that Mr. Chin had asked [Crystal] if he could obtain a commercial loan. [Crystal] said that he could, and that he could get the loan approved in thirty days, but would need Mr. Chin to deposit $44,000.00 into the business account belonging to [Crystal] as a down payment. Mr. Chin went to the Bank of America to deposit a check in the amount of $44,000.00 into the business account of [Crystal], but was told that there would be a hold placed on the funds based on the low balance in the account of [Crystal]. [Crystal] then told Mr. Chin to have the funds wired into the account to avoid the hold. On March 2, 2007, Chen Chiou Chin wired $44,000.00 into the business account belonging to [Crystal], listed under the name "JT Crystal Corp. o/b/a Crystal Group and Associates Corp.," with an address of 1111 Brickell Avenue, Suite 1100, Miami, Florida, 33131-3122, located in Dade County, Florida. Mr. Chin stated that [Crystal] told him that the loan would be approved with an interest rate of 8.25%, and that he never signed a contract with [Crystal]. Your Affiant learned that [Crystal] had applied for a loan through the Small Business Loan Source (SBLS), and had told Mr. Chin not to contact SBLS.

Your Affiant then spoke with Ron Andreaus of Small Business Loan Source, located in Pinellas County, Florida. Your Affiant learned that [Crystal] had applied for a loan on behalf of Chen Chiou Chin, d/b/a Cool Treats, Inc. As part of the process, SBLS would send out a "Proposal Letter," which would be signed by the person applying for the loan, and returned with a check for $1,500.00. Your Affiant learned that a Proposal Letter for a loan for Chen Chiou Chin d/b/a Cool Treats, Inc. in the amount of $277,600.00 was sent by SBLS to [Crystal], and was returned in February 2007, with what purported to be the signature of Chen Chiou Chin. The $1,500.00 was not sent until more than a week later, and was in the form of a check written from the business account of [Crystal]. Your Affiant learned that the next step in the process would be a "Commitment Letter," which would also be signed by the person applying for the loan and returned with a check in the amount of $5,000.00. Your Affiant learned that a Commitment Letter, for a loan in the amount of $290,000.00, with an interest rate of "prime plus 2.50%" to Chen Chiou Chin d/b/a Cool Treats, Inc. was sent to [Crystal] and returned by [Crystal] with what purported to be the signature of Chen Chiou Chin and his wife, Megan Nguyen. [Crystal] also sent a $5,000.00 check, dated March 30, 2007, from his business account which was the same account that Chen Chiou Chin had the $44,000.00 wired to on March 2, 2007. Your

14

> Afliant learned that the $5,000.00 was presented twice and was not honored by the bank because of insufficient funds. Your Affiant learned that when the $5,000.00 check was returned, Ron Andreaus contacted Chen Chiou Chin directly and was told that Chen Chiou Chin had never seen the Proposal Letter or the Commitment Letter and had a different understanding of the terms of the loan. Ron Andreaus provided copies of the letters to Chen Chou Chin, who stated that the signatures on the letters are not his or his wife's. Your Affiant received these copies from Chen Chiou Chin and did confirm that the signatures appearing on the letters sent by [Crystal] to SBLS do not belong to Chen Chiou Chin or Megan Nguyen. Your Affiant also learned from Ron Andreaus that SBLS only requires $1,500.00 at the time of the Proposal, and $5,000.00 at the time of Commitment, and would not have required $44,000.00.
>
> Your Affiant then received bank records, pursuant to subpoena, for the Bank of America account belonging to [Crystal], under the name JT Crystal Corp. d/b/a Crystal Group and Associates Corp., matching the account numbers on the checks issued to SBLS and the account that Chen Chiou Chin wired $44,000.00 into. The records show that the balance in the account on February 1, 2007, was $3,604.60 and $8,596.72 at the end of February 2007, with negative balances noted on several occasions throughout the month. On Friday, March 2, 2007, before the $44,000.00 deposit was made by Mr. Chin, the balance was $7,605.85. On Monday, March 5, 2007, the balance in the account was $23,162.32, with a large amount having been withdrawn and provided to a law firm representing [Crystal] in a pending criminal case. During the rest of March 2007, the daily balance in the account continued to decrease with an amount of deposits/credits for the month of $54,778.75 and withdrawals/debits of $54,274.49.
>
> Your Affiant learned that Chen Chiou Chin requested his $44,000.00 that [Crystal] had claimed was being held in "escrow," and [Crystal] has not returned the money.

Crystal pleaded guilty to grand theft, in violation of Section 812.014, Florida Statutes.

(Doc. 9-2 at 147) *Pizzo*, 945 So. 2d 1203, 1207, identifies the following elements of the crime:

> (1) knowingly (2) obtaining or using, or endeavoring to obtain or use, property of another (3) with intent to deprive the person of a right to the property or a benefit therefrom, or to appropriate

15

the property to one's own use or to the use of any person not entitled thereto.

Crystal received a wire for $44,000.00 from Chin for a down payment on a commercial loan because Crystal told Chin that he was a mortgage broker and promised to assist Chin to obtain a loan. Crystal told Chin that he would safeguard the money in an escrow account. Crystal applied for a commercial loan through the Small Business Loan Source for Chin and forged Chin's signature on a proposal letter and a commitment letter. Instead of keeping the money that Chin wired in an escrow account and using the money to obtain a loan for Chin, Crystal kept the money in a personal account and used the money for personal expenses, including payment to a lawyer for representation in a criminal case. After Chin requested return of the money from the escrow account, Crystal failed to return the money.

This evidence demonstrated that Crystal violated Section 812.014 by fraudulently obtaining from Chin $44,000.00 and permanently depriving Chin of the money for his own use. *McKernan v. State*, 967 So. 2d 966, 968 (Fla. 4th DCA 2007) ("Appellant intentionally deprived the victims of the money which they paid for these policies with the purpose of garnering commissions for himself.").

A trial judge reviewed each affidavit and determined that probable cause supported Crystal's arrest. (Doc. 9-2 at 58, 145) Because Crystal fails to demonstrate that, in light of any new reliable evidence, "'no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt,'" he fails to demonstrate that a miscarriage of justice based on actual innocence excuses the time bar. *McQuiggin*, 569 U.S. at 386 (quoting *Schlup*, 513 U.S. at 324).

Accordingly, Crystal's petition (Doc. 1) is **DISMISSED** as time barred. The Clerk is **DIRECTED** to enter a judgment against Crystal and **CLOSE** this case.

### DENIAL OF CERTIFICATE OF APPEALABILITY AND LEAVE TO PROCEED *IN FORMA PAUPERIS*

Because Crystal neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** in Tampa, Florida on April 28, 2025.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

17